ROBERT A. ZINK
Acting Chief
WILLIAM E. JOHNSTON
DANNY NGUYEN
Trial Attorneys
Criminal Division, Fraud Section
1400 New York Avenue, NW
Washington, DC 20530
(202) 514-0687 (Johnston)
(202) 353-0183 (Nguyen)

NICHOLAS A. TRUTANICH
United States Attorney
RICHARD ANTHONY LOPEZ
Assistant United States Attorney
District of Nevada
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336

Attorneys for the United States

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 2:15-cr-00198-GMN-NJK-1 |
| | ) | |
| v. | ) | **THE GOVERNMENT'S SENTENCING** |
| | ) | **MEMORANDUM** |
| EDWIN FUJINAGA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**CERTIFICATION**:  The undersigned certify that this pleading is timely filed.

Pursuant to LCR 32-1(d), the United States, by and through the undersigned, respectfully

submits its sentencing Memorandum in the above captioned case.

1

## I.   Summary

For more than a decade Edwin Fujinaga ran a massive Ponzi scheme through his Las Vegas-based company MRI International.  From 2000 to 2013, he stole over $1 billion dollars from almost 10,000 victims in Japan, most of whom were merely looking for a safe investment for their retirements.  Year after year, Fujinaga told his victims he would use their money for one purpose only: to buy medical accounts receivables (MARS).  He promised a 6-10% rate of return based on MRI's supposed ability to collect more money on the MARS than their purchase price.  He assured victims that an escrow company would protect their money from misuse.  These were all lies.  Instead, in typical Ponzi-scheme fashion, he used the vast majority of investor money to pay back old investors.  He spent the rest on a life of luxury and unsuccessful business ventures that gave his scheme a veneer of legitimacy.  When the scheme started to unravel in 2011 and investor payments were delayed, Fujinaga only doubled down.  He continued to raise hundreds of millions of dollars from new victims in Japan and concocted a story about the State of Nevada auditing him to explain the delays.  When the Japanese government halted his ability to raise new funds in early 2013, he owed his victims $1.57 billion.

Fujinaga was charged for his criminal conduct on July 8, 2015.  After a five-week trial in November 2018, he was convicted by a jury on all 20 counts of the Indictment.  The statutory maximum he faces for these 20 counts of conviction is 370 years' imprisonment.  The Probation Office has correctly calculated his Guidelines offense level at 43 (the maximum), which corresponds to a Guidelines range of life imprisonment.  The United States respectfully requests that the Court impose a sentence of 20 years' imprisonment as to counts 1 through 8, a consecutive sentence of 20 years' imprisonment as to counts 9 through 17, and a consecutive sentence of 10 years' imprisonment as to counts 18 through 20.  A total sentence of 50 years' imprisonment is fully justified in light of the sentencing factors contained in 18 U.S.C. § 3553(a).  Additionally,

the Government respectfully requests that the Court impose a three-year term of supervised release following imprisonment, along with any conditions of release that the Court deems necessary, and an order of restitution in the amount of $1,129,409,449.  Such a sentence is necessary to impose a just punishment, promote respect for the law, and most importantly to afford adequate deterrence to similar criminal conduct.

## II.     Facts

### A.     Procedural Posture

Edwin Fujinaga, 72, was charged in an Indictment, returned on July 8, 2015, with 20 counts:

- Mail Fraud (Counts 1 through 8 – 18 U.S.C. § 1341)

- Wire Fraud (Counts 9 through 17 – 18 U.S.C. § 1343)

- Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (Counts 18 through 20 – 18 U.S.C. § 1957)

All the charges related to his operation of the MRI Ponzi scheme.  Fujinaga was arrested on July 9, 2015 and released on a personal recognizance bond.  Trial began on October 29, 2018.  On November 27, 2018, the jury returned a verdict finding Fujinaga guilty on all counts.  Upon conviction Fujinaga was remanded into custody.

### B.     The Facts Giving Rise to the Offense Conduct

As the Court learned during the trial in this case, Fujinaga was the President and CEO of MRI International, a supposed investment company based in Las Vegas.  For over a decade, Fujinaga offered the MARS investment product to thousands of ordinary investors in Japan.  The company had all the trappings of legitimacy:  scores of employees, headquarters in a gleaming office park, investor tours, slick advertising campaigns, and a large fundraising team in Japan headed by his co-defendants Junzo and Paul Suzuki.  In reality, the company was an elaborate

Ponzi scheme.  From very early on, Fujinaga was not able to generate any profit from purchasing medical claims and collecting on them.  Rather than come clean to those initial investors that he could not pay the promised returns of 6-10%, he used new investor money to pay the old ones back.  These payments lulled investors into a false sense of security, and convinced them to reinvest many multiples of their original amounts on the belief that MARS purchased by MRI were a safe and stable source of return.  At the same time, Fujinaga spent the balance of investor money on himself and purchases of medical-related business

Fujinaga's lies to investors were unambiguous, brazen, and constant:  (1) all investor money would be used to purchase MARS only; (2) investor money would be protected by escrow; and (3) collections on MARS would be placed in a "lockbox" account to prevent misappropriation.  These lies appeared repeatedly in the legal documents and marketing materials sent to investors.  Fujinaga knew these lies were crucial to keep the fraud going.  For example, in a fax sent on March 25, 2007, Paul Suzuki wrote to Fujinaga, "Our biggest sales point in Japan is the safety of the funds collected.  The second biggest sales point is that we use the funds to purchase only MARS (with the right technology and the right personnel, a very reliable receivable to invest in)."  GX 25.  Moreover, investors regularly received account statements that showed their investments earning interest, lulling them into believing the MARS collections were generating profits.  They received interest payments as scheduled, reinforcing their belief that their investments were safe and profitable.  Right until the end, Fujinaga was repeating his lies to investors.  In a letter dated September 13, 2012, Fujinaga wrote to an investor who had complained about his delayed interest payment that "All reinvested funds are deposited into a trust account with escrow and transferred only by escrow to purchase a set pool of MARS for a fixed period of time."  GX 169.

Fujinaga controlled exactly what investors learned by reviewing and approving most of the marketing materials and legal documents they received.  He reviewed and approved the Financial

Products Trading Contract, which every investor received before investing and which spelled out, in no uncertain terms, that "Funds are used for purchasing MARS only." GX 137, 178. He provided regular updates on what should or should not be disclosed to investors. In a fax to Keiko Suzuki on September 29, 2009, Fujinaga provided a 16-page "clarification of our disclosure information for Japan investors." GX 74. Through this careful control of information, Fujinaga intentionally hid from investors that he was using some of their funds to buy medical practices rather than MARS. For example, in a fax to Paul Suzuki on March 27, 2007, Fujinaga wrote, "Please do not use the Four Seasons Medical Group identity in any of our disclosure materials in Japan . . . ." GX 26.

Fujinaga ran this Ponzi scheme from top to bottom for his own benefit. Fujinaga had exclusive control over how investor money was used. Peter Munoz, the supposed independent escrow agent, took all direction from Fujinaga. And Munoz would not move investor funds unless Fujinaga instructed him. Incoming investor funds either went back out to repay old investors, into Fujinaga's other businesses, or to finance the private jet flights, the fleet of luxury cars, and sprawling homes that came to define his life. In the absence of any profits, investor money paid for everything in Fujinaga's life, from the mundane to the extravagant—golf club memberships, alimony payments, and gardening services at his California ranch. These expenditures underscore how Fujinaga's unbounded greed, rather than any misplaced optimism, was the engine that fueled this Ponzi scheme.

Even more troubling is that Fujinaga showed no signs of stopping, even as the scheme crumbled around him. In 2012, when incoming investor funds could no longer cover the interest and liquidation payments to old investors, Fujinaga pressed the Suzukis to redouble their fundraising efforts. In a fax to Paul Suzuki on August 1, 2012, Fujinaga wrote, "I need your help to focus on raising funds to pay for all delayed liquidation payments." And the Suzukis did just

as Fujinaga requested.  Meanwhile, to explain the delayed payments, Fujinaga spun elaborate tales about an audit by the State of Nevada and a supposed $30 million reserve that had to be created to cover foreign exchange fluctuations.  When the delayed payments prompted Japanese regulators to investigate MRI, Fujinaga changed his story to them and said there were no state auditors who had halted investor payments.  Over the course of 2012 and early 2013, Fujinaga took another $150 million from investors, despite knowing he already owed prior ones over $1 billion and had no hope of ever repaying it.  There is little doubt that Fujinaga would be running his Ponzi scheme to this day had his ability to raise funds in Japan not been halted—and the resultant investigations that led to his conviction not occurred.

## III.    Legal Standard

Proper sentencing procedure requires that, before imposing sentence, the district court: (1) correctly calculate the Sentencing Guidelines range; (2) treat the Guidelines as advisory; (3) consider the 18 U.S.C. § 3553(a) factors; (4) choose a sentence that is not based on clearly erroneous facts; (5) adequately explain the sentence; and (6) not presume that the Guidelines range is reasonable.  *United States v. Carty*, 520 F.3d 984, 991-93 (9th Cir. 2008). When the court imposes a sentence within the Guidelines range, "'it is probable that the sentence is reasonable'" because the court's application of the § 3553(a) factors accords with the Sentencing Commission's independent application of those factors in the "mine run of cases."  *United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).

It would constitute procedural error, however, for the court to "attach [ ] a presumption of reasonableness to the Guidelines range or weight[ ] the Guidelines range more heavily than other § 3553(a) factors." *Carty*, 520 F.3d at 994.  The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also consider the § 3553(a) factors "in determining the appropriate sentence." *Nelson v. United States*, 550 U.S. 350, 352 (2009).

6

**B.  The PSR's Offense Level Computation is Correct**

The probation office has correctly calculated Fujinaga's total offense level as 43, with a guidelines range of life imprisonment.  The adjusted offense level is actually 51, but the Guidelines treats any offense level above 43 as equivalent of 43.  *See* U.S.S.G. Ch. 5, Pt. A comment n. 2. The government agrees with the PSR's Guidelines calculation, but will address only those enhancements that Fujinaga has objected to.  However, even if the Court agrees with a number of Fujinaga's objections related to victim enhancements (see *infra*), the adjusted offense level will still be above a level 43, and thus his objections make no difference in the calculation of his Guidelines range.

**C.  The Loss Level is Greater than $550,000,000**

The loss level has been correctly identified as greater than $550,000,000, resulting in a level 30 increase to the base offense level of 7.  While the total amount owed investors was $1,568,624,235, see GX 475 – as reflected in the investor database maintained by Shiu Ling Lam, which listed all the outstanding investor certificates as of April 26, 2013 – the entire amount cannot qualify as loss under the guidelines, because some of the investor certificates contain a portion of accrued interest that was recapitalized and became principal.  Loss, per the Guidelines, cannot include "[i]nterest of any kind . . . [or] amounts based on an agreed-upon return or rate of return." U.S.S.G. § 2B1.1, comment n. 3(D)(i).  However, other evidence at trial established that the actual monetary loss to investors was far in excess of $550,000,000, indeed above $1 billion.  For example, Government Exhibit 267 (*see* Exhibit 30) was the balance sheet for MRI as of March 31, 2013, which showed that $813,199,881.05 was owed to the Class A, Select A, and holding accounts, all of which were funded almost exclusively with investor money.  Peter Munoz testified that the $813 million figure represented money he had recorded as going into the MRI general account from the investor-funded accounts since the beginning of MRI's operation.  Trial Tr.

7

11/7/18, 192:9-196:19.  Importantly, that figure did not capture the liquidation payments made directly out of the Class A account back to investors.  Trial Tr. 11/8/18, 77:4-78:15.  A sum of those liquidation payments taken from spreadsheets from January 2009 to March 2013 contemporaneously prepared by Munoz show that $316,119,882.44 was paid out during the last 4 ¼ years of the scheme.  *See* Exhibit 31.  When added together, a low-end estimate of loss is $1,129,319,763.49, because it does not include any of the liquidations that were made from 2000 to December 2008.

Other evidence at trial further supports a loss figure far in excess of $550,000,000.  For example, the banking records reviewed by Michael Petron established that between January 2009 and May 2013 *alone* Fujinaga misappropriated almost $680 million of investor money.  GX 450.  Given that the scheme dates back to 2000, the true loss figure is almost certainly above $1 billion and closer to the $1.57 billion figure reflected in the investor database.  But, per the Guidelines, the "court need only make a reasonable estimate of loss," which "is entitled to appropriate deference."  U.S.S.G. § 2B1.1, comment n. 3(c).  And there is more than enough evidence for the Court to make a reasonable estimate that the loss is above $1 billion.

### D.  More than 25 Victims Experienced Substantial Financial Hardship

The PSR also correctly applied a 6-level enhancement under U.S.S.G. § 2B1.1(b)(2)(C) for substantial financial hardship to more than 25 victims.  Among the factors the Court is to consider when determining whether a victim has suffered substantial financial hardship is whether they have suffered "substantial loss of a retirement, education, or other savings or investment funds" or had to make "substantial changes to his or her employment, such as postponing his or her retirement plans."  U.S.S.G. § 2B1.1, comment n. 3(C).  Given the sheer number of victims – nearly 10,000 – and the total amount of loss – over $1 billion – there is more than enough evidence before the Court for it to conclude by preponderance of evidence that more than 25 victims

8

experienced substantial financial hardship.  The loss to the median victim is between $100,000 and $150,000, a significant sum of money for all but the wealthiest individuals.  And, of course, many victims lost much more.  As demonstrated in reports from witness interviews (*see* Exhibits 7 to 11), depositions from the various civil litigation involving the MRI scheme (*see* Exhibits 1 to 6), trial testimony in this case, and victim impact statements provided by defrauded investors (*see* Exhibits 12 to 29), over 25 victims have detailed the impact of the significant financial harm they have suffered as a result of Fujinaga's scheme.  Many of these victims invested the vast majority of their assets in the fraudulent MRI scheme.  Indeed, the Court heard from three of these victims at trial – Eiko Uchiyama invested and lost 90 percent of her total assets and had to resume working, GX 293; Fumi Nonaka invested and lost 70 percent of her total assets, and has had to delay her retirement; and Hideki Hasegawa invested and lost 70 percent of his total assets and had to resume working, GX 291.

Notably, the substantial harm described by over 25 victims in these statements are just a small subset—less than 1%—of the nearly 10,000 victims in this case.  There is no doubt that many other victims of Fujinaga's scheme suffered substantial financial harm similar to that described in these various statements.  Based on this evidence, the Court can conclude that Fujinaga's actions warrant the 6-level enhancement under U.S.S.G. § 2B1.1(b)(2)(C).

### E.  An Enhancement for Vulnerable Victims Applies

The PSR correctly applied a 2-level enhancement under § 3A1.1(b)(1) for vulnerable victims.  The enhancement applies if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1).  Here, Fujinaga did know that many of his investors were elderly.  He pitched MARS as a safe investment that would generate steady rates of return, a pitch designed to appeal to those approaching retirement.  Indeed, the victims who testified at trial were either already retired or had planned to be retired in the near future due

to the expected returns from the MRI investment.  On February 12, 2008, a fax from Keiko Suzuki to Fujinaga suggested that they exclude all investors "over the age of 80."  GX 34.  This suggestion put Fujinaga on notice that many of MRI's investors were quite elderly; but it was never followed.  The Financial Products Trading Contract, the legal document governing the investment relationship, contained restrictions that no investor could be a U.S. citizen, but contained no age restrictions.  GX 137, 178.  Indeed, the same contract contained provisions allowing for the inheritance of MRI investment certificates, clearly contemplating that many elderly investors would pass away while still invested in MRI.  In sum, there is sufficient evidence for the Court to conclude that Fujinaga knew or should have known that his victims were elderly.

Fujinaga has objected to the enhancement, pointing to evidence that he told an elderly investor not to invest.  There was no such evidence at trial.  The closest Fujinaga came to dissuading anyone from investing in MRI was when, in a fax to Keiko Suzuki on October 22, 2003, Fujinaga wrote,

> [N]o investment is 100% secure other than an investment in the U.S. government at very low interest rates because of the security afforded by an investment with the United States government.  It is my recommendation that if this investor is insecure, they should only invest with the Japanese government or the U.S. government such as in long term bonds and treasuries.  The Interest rate however will be very low. Each individual investor must gauge the various forms of risk when investing and must diversify their investment portfolio to achieve their ideal risk tolerance.

GX 2.  This generic disclosure, aside from remaining silent on the issue of the investor's age, is entirely consistent with MRI's pitch that MARS were a relatively safe investment.  An investment fraud scheme that touts safety, reliability, and modest rates of return is bound to attract the elderly interested in a conservative option in advance of, and for the duration of, their retirement.  Accordingly, Fujinaga knew exactly who he would draw into his fraudulent scheme.

**V.      A 50-year Term of Incarceration is Warranted under Section 3553(a) Factors**

The government submits that a 50-year term of incarceration is "sufficient but not greater than necessary to comply" with the factors articulated in 18 U.S.C. § 3553(a).  The nature and circumstances of the offense, the history and character of the defendant, the need for a just punishment, and the need to afford adequate deterrence to similar criminal conduct all warrant such a sentence.

**A.      The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense**

The nature and circumstances of the offense are appalling.  Fujinaga perpetrated one of the largest Ponzi schemes in U.S. history.  Year after year, he stole and misused hundreds of millions of dollars from ordinary investors, knowing that he would never be able pay them back.  He maintained the façade that MRI was a legitimate investment company for more than a decade by telling lie after lie.  He surrounded himself with impressionable and obedient employees whom he placed in information silos so they would do his bidding without probing other parts of his operation.  When investors became concerned about the safety of their investments, he lied to them again, claiming a routine audit from the State of Nevada was the cause of delayed interest payments.  At the same time, Fujinaga convinced the Suzukis to raise over a hundred million dollars in additional funding from investors, while Fujinaga continued to enjoy his glitzy mansions and luxury cars.  Though all Ponzi schemes eventually collapse, the evidence at trial showed that Fujinaga was perfectly willing to delay the inevitable for as long as possible at the cost of still thousands more lives ruined.  Few financial crimes – aside from those of Bernie Madoff and Allen Stanford – have wrought as much financial destruction as Fujinaga's.  Only a substantial sentence of many decades long will reflect that fact.

11

The eye-popping numbers involved in Fujinaga's Ponzi scheme also risk obscuring the individual tales of human suffering.  The Court heard five of those tales in person at trial.  Fumi Nonaka testified that she had planned to move back to Japan after retiring to live with her widowed mother, but had to delay the move for many years because of the investment she lost with MRI. Hideki Hasegawa had to return to work as a "cram" school teacher.  The harm caused by Fujinaga's scheme has extended far beyond the victims' financial lives.  One victim, M.A., was committed to a psychiatric hospital and ultimately committed suicide because "she profoundly regretted the foolishness" of her decision to invest 37.5 million yen—all of which was lost—with MRI.  *See* Exhibit 12.  Her husband, I.A., talked about how his family's life "has been completely derailed" and that their "happy family life has completely turned around 180 degrees"; that his wife's death "has been a major wound for [their] two children"; and that he bore the costs of, among other things, his wife's hospitalization and personal counseling.  *Id.*.  Another victim, N.Y., lost "almost all of [his] savings . . . and most of [his] retirement benefits . . . from work," which led to his wife falling ill and having to "receive professional mental health care ever since."  *See* Exhibit 15.  S.I., whose daughter suffers from an immune system disease, now faces uncertainty over the care of her daughter because she lost 100 percent of her investment with MRI, which she had hoped would yield additional income that could be used for her daughter's medical care.  *See* Exhibit 7.  And another victim, F.T., has had to rely on her elderly in-laws to help care for her children—one of whom has epilepsy—so that she can resume full-time employment.  *See* Exhibit 17.  Many more tales of suffering and heartbreak accompany this sentencing memorandum.

But these statements can only give the Court a small glimpse of the lives ruined by Fujinaga's callousness and greed.  Behind every single unpaid investment certificate is a personal and financial dream that has been shattered.  Thousands of ordinary people will have to continue working for years – delaying their retirements, shelving life plans, deferring time with friends and

family – just to replace the money that had been entrusted to Fujinaga.  In light of this suffering, no length of incarceration for Fujinaga will be too long.

**B.     The History and Characteristics of the Defendant**

Fujinaga perpetrated his Ponzi scheme for more than a decade despite having no prior criminal record.  There is little in Fujinaga's background that sheds light on the astounding level of greed and deceit he displayed for so long.  Nothing in his childhood indicates that he failed to develop a moral compass.  Fujinaga graduated from high school and college and lived in Honolulu until 2000, when he moved to Las Vegas to start MRI.  He had a successful career in real estate before starting MRI.  He was not addicted to drugs or alcohol.  In short, there are no mitigating factors that would put his crimes in a more understandable light.

Fujinaga's unblemished past was partly what enabled him to perpetrate this fraud.  Wary investors doing their due diligence might have discovered a prior criminal conviction if he had had one.  Instead, Fujinaga looked the part: a successful Japanese-American businessman who seemed to glow in the optimistic light under which many Japanese viewed the United States.  Fujinaga exploited this perception to his benefit.  He knew his Japanese heritage, along with the safety mechanisms purportedly baked into the MARS investment, would appeal to those cautious investors who might have otherwise balked at wiring their savings to another country.

At no point has Fujinaga showed any contrition or remorse.  He rejected every opportunity to come clean to investors—and later to the Japanese government, the SEC, and the DOJ.  To this day, he has, implausibly, maintained his innocence.

In sum, his personal history and characteristics counsel against leniency.

### C.     The Need for Just Punishment, Adequate Deterrence, and the Avoidance of Unwarranted Sentencing Disparities

This case is one of the most egregious financial crimes in U.S. history, and requires a sentence that reflects that fact.  Through cunning and greed, Fujinaga stole over $1 billion from almost 10,000 ordinary people.  There are no mitigating circumstances: No legitimate business opportunity that might have proved successful had he been given more time. No temporary diversion of investor funds to cover a minor setback in a legitimate business.  This was a decade-long swindle on an epic scale.  Courts have long recognized that the greater the financial harm and the more prolonged the theft, the more severe a sentence should be.   To the government's knowledge, every defendant convicted of a Ponzi scheme in excess of $1 billion dollars has received an incarceration term of at least 50 years:

| Defendant | Case Number | Loss Amount | Sentence |
|---|---|---|---|
| Bernard Madoff | 1:09-cr-213 (S.D.N.Y) | $64.8 billion | 150 years |
| Allen Stanford | 4:09-cr-342 (S.D. Tex.) | $6 billion | 110 years |
| Scott Rothstein | 0:09-cr-60331 (S.D. Fl.) | $1.2 billion | 50 years |
| Thomas J. Petters | 0:08-cr-364 (D. Minn.) | $3.6 billion | 50 years |
| James P. Lewis | 8:04-cr-0016 (C.D. Cal.) | $311 million | 30 years |
| Timothy Durham | 1:11-cr-42 (S.D. Ind.) | $216 million | 50 years |

Even those who stole only a percentage of the amount of funds Fujinaga did in this case have received incarceration terms of approaching 50 years.   Accordingly, a 50-year term of imprisonment adequately reflects the enormity of Fujinaga's crimes.

A 50-year incarceration term also ensures there are not unwarranted disparities in sentences.  As the above table demonstrates, courts have consistently viewed massive Ponzi schemes as the most serious type of financial crime that can be committed, and have imposed periods of imprisonment that are many decades in length.

14

More importantly, a 50-year incarceration term also provides adequate general deterrence for frauds of this magnitude. While the government is aware that 30, or even 20 years imprisonment is functionally a life sentence for someone of Fujinaga's age – 72 years old – a longer term of 50 years can provide additional deterrence to other fraudsters contemplating similar schemes who may be much younger than Fujinaga currently is. Such a sentence sends a message to anyone thinking of committing a financial crime of a similar magnitude that he or she will likely spend the rest of their lives in prison if they choose to do so.

**VI.  Restitution**

Fujinaga's convictions for wire fraud and mail fraud carry with them mandatory restitution. 18 U.S.C. § 3663A. The government has submitted a list to probation that requests an order of restitution in the amount of $1,129,409,449. To arrive at this number, the government had to first disentangle the percentage of the total investment amount ($1,568,624,235) that was due to accrued and recapitalized interest, which cannot be used for restitution or loss calculation. The government had to arrive at an estimate because complete banking recordings going back to 2000 did not exist. As detailed in Section III.C, a low-end estimate of the loss figure, $1,129,319,763.49, was calculated from different contemporaneous accounting records created by Peter Munoz. *See* Exhibits 30 & 31. A discount rate of 72% was calculated by dividing $1.1293 billion into $1.5686 billion. This 72% was then applied to the face amount of each outstanding investment certificate for each victim to arrive at the total amount owed to each victim; the sum of all these individual calculations is $1,129,409,449. While this discount likely understates the amount actually owed to victims, this ensures that Fujinaga is not ordered to pay any accrued interest back to victims. Accordingly, there is a high degree of certainty that a $1.129 billion restitution order does not overstate the amount of investor loss.

15

**VII.    Conclusion**

      Fujinaga's crimes have inflicted enormous suffering upon thousands and thousands of lives.   While the statutory maximum is 370 years, and the Guidelines call for a sentence of life imprisonment, a sentence of 50 years' imprisonment adequately balances the § 3553(a) factors. The government also respectfully requests that the Court impose a three-year term of supervised release following imprisonment, impose any conditions deemed necessary by the Court as part of his supervised release term, and to enter an order of restitution in the amount of $1,129,409,449.

                             Respectfully submitted,

Dated:  April 4, 2019

                             ROBERT ZINK
                             Acting Chief
                             Criminal Division, Fraud Section
                             United States Department of Justice

                             /s/ William Johnston
                             WILLIAM E. JOHNSTON
                             DANNY NGUYEN
                             Trial Attorneys
                             Criminal Division, Fraud Section

                             NICHOLAS TRUTANICH
                             United States Attorney
                             District of Nevada

                             /s/ Richard Anthony Lopez
                             RICHARD ANTHONY LOPEZ
                             Assistant United States Attorney
                             District of Nevada

1

## <u>CERTIFICATE OF SERVICE</u>

2       I certify that I am an employee of the United States Department of Justice, Criminal

3  Division, Fraud Section.  A copy of this opposition memorandum was served upon counsel of

4  record, via Electronic Case Filing (ECF).

5

6  **DATED** this 4th day of April, 2019.

7                              /s/ William Johnston

                                WILLIAM JOHNSTON

8                              Trial Attorney

9                              Criminal Division, Fraud Section

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24