RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
HEIDI OJEDA
Assistant Federal Public Defender
Nevada State Bar No. 8124
411 E. Bonneville, Ste. 250
Las Vegas, Nevada 89101
(702) 388-6577/Phone
(702) 388-6261/Fax
Heidi_Ojeda@fd.org

Attorney for Edwin Fujinaga

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>EDWIN FUJINAGA,<br><br>    Defendant. | Case No. 15-cr-198-GMN-NJK<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

<u>Certification</u>: This Sentencing Memorandum is timely filed.

Defendant Edwin Fujinaga, through his attorney, Heidi A. Ojeda, Assistant Federal Public Defender, submits his Sentencing Memorandum for the Court's consideration in fashioning a fair sentence. Mr. Fujinaga reserves the right to supplement this Memorandum with additional information or authorities, as the Court may permit, at or before the sentencing hearing currently scheduled for April 11, 2019 at 10:30 a.m.

DATED this 4th day of April, 2019.

                    RENE L. VALLADARES
                    Federal Public Defender

              By:   */s/ Heidi Ojeda*
                    HEIDI OJEDA
                    Assistant Federal Public Defender

## I. A 60-MONTH SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO DO JUSTICE IN THIS CASE

Title 18, Section 3553(a) of the United States Code directs sentencing courts to impose the minimally-sufficient sentence to achieve the statutory purposes of punishment — justice, deterrence, incapacitation, and rehabilitation — by imposing a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Section 3553(a) represents a cap above which this Court is statutorily prohibited from sentencing, even when a greater sentence may be recommended by the Sentencing Guidelines. *Id*. The Guidelines are statutorily subordinate to the parsimony principle of § 3553. *Id*.

Section 3553(a)(2) states that the sentence imposed in any case should fulfill the following needs: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Section 3553(a) further directs sentencing courts to consider, *inter alia*, the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; as well as the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1), (3), (6), (7).

Significantly, "[t]he district court may not presume that the Guidelines range is reasonable." *United States v. Carty*, 520 F.3d 984, 991, 994 (9th Cir. 2008) (en banc) ("It would have been error had the [district court] judge actually attached a presumption of reasonableness to the Guidelines range or weighted the Guidelines range more heavily than other § 3553(a) factors."). Thus, "the Guidelines factor [should not] be given more or less weight than any other" section 3553(a) factor. *Id.* at 991.

2

Factors exist here that support a downward adjustment from the sentencing range which would result in a sentence that is "sufficient, but not greater than necessary" to address the factors of 18 U.S.C. § 3553. *See Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 599 (2007) ("[T]he unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, 'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.'" (citation omitted)).

### A. The Nature and Circumstances of the Offense Warrant a Downward Variance (18 U.S.C. § 3553(a)(1))

#### 1. MRI's misrepresentations were the product of reckless management as opposed to the specific intent to defraud.

The Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), found critically important that a defendant's sentence consist of "a strong connection between the sentence imposed and the offender's *real conduct*." *Id.* at 2246 (emphasis added). Consideration of the nature and circumstances of the offense is particularly important in a case like this where several of the sentencing enhancements that increase the recommended sentence substantially overlap. *See, e.g.*, *United States v. Jackson*, 346 F.3d 22, 26 (2d Cir. 2003) (noting the sentencing enhancements "are all little more than different ways of characterizing closely related aspects of [the defendant's] fraudulent scheme. Thus, his base level of 6 was increased 10 levels because his offense involved a large sum of money, another 2 levels because he *carefully planned the activity*, another 2 levels because he *used sophisticated means*, and another 4 levels because *the scheme was extensive*. Even though these enhancements are sufficiently distinct to escape the vice of double counting, they substantially overlap. Most fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive." (emphasis added)).

Here, the nature and circumstances of the offense militate in favor of a downward variance. *See* U.S.S.G. § 3553(a)(1). While MRI was undoubtedly negligently managed, Mr.

3

Fujinaga did not create MRI with the intent to defraud his investors nor was MRI run as a typical Ponzi scheme. Careless management and a desperate attempt to financially recover MRI following a debilitating shift in the yen to dollar exchange rate led to the decision to recruit new investors to keep MRI afloat. While Mr. Fujinaga's decisions and MRI's actions violated the law, the circumstances leading up to these violations should be contrasted to those businesses that are created for the sole purpose of defrauding investors for personal gain.

Unlike most Ponzi schemes, Mr. Fujinaga entered into the Medical Accounts Receivables ("MARS") industry because he truly believed he could create a business that would provide medical healthcare providers with an effective billing and collections service greatly needed throughout the industry. *See* Ex. A (Letter from Mr. Fujinaga). For years, MRI operated as a successful Medical Accounts Receivables provider—making collections, generating a profit, and providing returns to its investors. As Certified Fraud Examiner, Anne Layne, testified, MRI did not possess the most common indicators of a Ponzi scheme—unlike most Ponzi schemes, which operate out of a shell company, MRI was providing services, paying taxes, and hiring employees.

Despite Mr. Fujinaga's intent to successfully run MRI, decisions were made that were careless and negligent, and economic factors beyond anyone's control, ultimately led to MRI's demise. *See* Ex. A (Letter from Mr. Fujinaga). The language barrier between Mr. Fujinaga and his business partners precluded Mr. Fujinaga from understanding the precise information that was being promised to the Japanese investors. Notably, Mr. Fujinaga's Japanese business partners, Junzo and Paul Suzuki, who were responsible for creating the Japanese marketing materials that contained the misrepresentations and who the government originally indicted alongside Mr. Fujinaga, continue to live in Japan free of any criminal liability.

While negligent management led to several significant inconsistencies in the promises MRI made to its investors, Japanese investors including Takao Makimura, Ikuo Miyahara, and Fumi Nonaka, testified that MRI did, in fact, provide contracts to investors that contained

4

language informing them their money might not be used solely for the purchase of MARS. Specifically, these contracts contained language that investor money could be used to purchase MARS *and* execute collections, which included businesses covered by the investment. Additionally, MRI provided its investors with contracts that documented some of the risks accompanying the decision to invest with MRI—thereby undermining attempts to show MRI's recruitment efforts were entirely based on an intent to defraud. This inconsistent language in the contracts further demonstrates that MRI's misrepresentations were the product of egregious mismanagement and oversight and not the product of a plan to defraud investors.

As further evidence of MRI's mismanagement, Mr. Fujinaga chose to rely on employees like Peter Munoz, who was inexperienced and grossly unqualified to handle a multimillion dollar company that relied on investments involving a complex dollar to yen conversion. Munoz's inability to accurately record MRI's revenue led to inaccurate accounting that prevented Mr. Fujinaga from understanding the state of MRI's finances. Munoz's negligent failure to maintain MRI's various bank accounts and to keep investors' funds separate from MRI's other business accounts, resulted in MRI breaking one of the fundamental promises that it made to its investors—namely that it would keep investor funds in a separate account, to be used only for the purchase of MARS. Thus, the misrepresentation to investors—that investor money would be kept in secured, separate lockboxes, was the product of poor, careless management and not fraudulent intent.

While Mr. Fujinaga's negligent management ultimately violated the law, his original intent for the business was not based on defrauding MRI's investors. *See* Ex. A (Letter from Mr. Fujinaga). Mr. Fujinaga's decision to recruit new investors in an effort to pay back earlier investors was a desperate attempt to recover the business following the crash of the dollar to yen exchange—a step that he took in addition to funneling his own capital in the business to try to keep MRI afloat. These actions stand in stark contrast to individuals that set out to create a

business for the sole purpose of defrauding investors and should be considered and reflected in Mr. Fujinaga's sentence.

### 2. The crash of the dollar to yen exchange rate contributed to the significant amount of loss

In 2008, MRI experienced significant financial troubles with the dramatic decrease of the value of the dollar to the yen.[1] As many Japanese investors' principal payments were made in yen, MRI was forced to repay principal amounts in values far higher than what was originally invested because of the dollar to yen conversion. This economic shift, which lasted for years, was not only unforeseeable, it was beyond Mr. Fujinaga's control and ultimately contributed to the significant amount of loss in this case. The amount of loss alleged by the government resulted in a 30-level enhancement, and therefore plays a substantial role in the recommended sentence.

Further, courts have noted that, in general, the Sentencing Guidelines place excessive weight on the amount of loss, which frequently creates a guidelines sentence that overstates the conduct of the offense. The Guidelines "tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (emphasizing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); *United States v.*

---

[1] In Japan, a Robust Yen Undermines the Market, New York Times (Oct. 10, 2008) https://www.nytimes.com/2008/10/28/business/worldbusiness/28yen.html ("The yen surged as much as 10 percent against the dollar last week."); Dollar Falls Against Yen, Euro, CNN Money (Dec. 17, 2008) https://money.cnn.com/2008/12/17/markets/dollar/index.htm; Milestones in the Yen History, Reuters, (Oct. 27, 2008) https://www.reuters.com/article/us-yen/timeline-milestones-in-the-yens-history-idUSTRE49Q1AN20081027; Dollar Hits 14-Year Low Versus the Yen, New York Times (Nov. 26, 2009) https://www.nytimes.com/2009/11/27/business/global/27dollar.html; Dollar Hits 15-Year Low Against Yen, CNN Money (Aug. 11, 2010) https://money.cnn.com/2010/08/11/markets/dollar_yen/index.htm; Dollar Falls Further Against Japanese Yen, BBC (Oct. 14, 2010) https://www.bbc.com/news/business-11541020.

*Treadwell*, 593 F.3d 990, 992 (9th Cir. 2010) ("[I]n considering the 18 U.S.C. § 3553(a) factors, the district court concluded that the amount of loss had 'a disproportionate effect' on Sluder's and Saturday's recommended Guidelines ranges."); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) ("[T]he guidelines provisions for theft and fraud place excessive weight on this single factor, attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes—to assign precise weights to the theft of different dollar amounts."); *United States v. Ayers*, 759 F. Supp. 2d 945, 957 (S.D. Ohio 2010) ("[T]he harsh sentence recommended by the Guidelines is primarily driven by the loss calculation, which increases [defendant's] Base Offense Level by 30 points. As has become common among district courts sentencing white-collar offenders in financial fraud cases, the Court finds that the loss calculation substantially overstates the gravity of the offense here and declines to impose a within-Guidelines sentence.").

Blind reliance on the loss amount can take away from evaluating "the offender's real conduct," and thus, a determination of Mr. Fujinaga's sentence without consideration of the dramatic economic circumstances surrounding MRI's demise, will lead to an unreasonable result. *Booker*, 220 U.S. at 246; *see e.g.*, *Emmenegger*, 329 F. Supp. 2d at 427 ("In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence. To a considerable extent, the amount of loss caused by this crime is a kind of accident, dependent as much on the diligence of the victim's security procedures as on [the defendant's] cupidity. Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more.").

Because the amount of loss alleged in this case alone warrants a 30-level enhancement, combined with the fact that reliance on the amount of loss often overstates the conduct of offense, this Court should consider varying downward from the government's recommended sentence. *See United States v. Carey,* 895 F.2d 318, 323 (7th Cir. 1990) (noting that a reduction in the recommended sentence is appropriate in cases where loss is "due to extrinsic reasons

beyond [the defendant's] control"); *United States v. Shattuck*, 961 F.2d 1012, 1017 (1st Cir. 1992) (noting "whatever distortive effects extraneous causes may have had on the total 'victim loss' calculation may warrant a *departure*) (emphasis in original)). In light of the unforeseeable economic circumstances surrounding the offense, a 60-month sentence is appropriate.

**B. The characteristics of the defendant warrant a downward variance (18 U.S.C. § 3553(a)(1)).**

**1. Mr. Fujinaga is 72-years old and has significant health issues.**

Mr. Fujinaga is 72 years-old. A 40-year sentence is an effective sentence of life imprisonment. Even a sentence half that time, is likely a life sentence for Mr. Fujinaga. Mr. Fujinaga has four children from two marriages. While his three children from the first marriage are older adults, Mr. Fujinaga has an 18-year old son from his second marriage that is still in high school. *See* Ex. B. (Letter from June Fujinaga). Forty years in prison will guarantee that Mr. Fujinaga's son will live the rest of his life without his father present in his life.

Mr. Fujinaga also suffers from significant health problems that require medical attention and that will continue to worsen the longer he spends in prison. Specifically, Mr. Fujinaga has high blood pressure, high cholesterol, known coronary disease, hypertension, and hyperlipidemia. *See* Exs. A and B (Letters from Mr. Fujinaga and June Fujinaga). Mr. Fujinaga also suffers from major depressive disorder and memory changes, which may be related to his family history of Alzheimer's. *See* Exs. A and B (Letters from Mr. Fujinaga and June Fujinaga). He also suffers from significant vertigo and may be at a higher risk for a stroke based on evidence found by his doctor of a previous stroke. *See* Exs. A and B (Letters from Mr. Fujinaga and June Fujinaga). Mr. Fujinaga currently requires the following medication Lisinopril and omiLodPine for high blood pressure; Omeprozole for acid reflux; Atorvostatin for high cholesterol; Fluticasone Propionate for allergies; Meclizine for vertigo and dizziness. *See* Ex. A (Letter from Mr. Fujinaga).

The Sentencing Commission recognizes that "[p]hysical condition . . . may be relevant in determining whether a departure is warranted." The sentence imposed must ensure that "needed . . . medical care" is provided "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). There is significant evidence that elderly prisoners often do not receive the medical treatment they need, or must endure significant wait-time before they are able to be treated by outside medical specialists. Not only is it incredibly costly to house elderly inmates, many prisons often lack the resources to effectively manage the elderly who suffer from substantial health problems. *See* U.S. Justice Dept. Report (May 2015) *The Impact of An Aging Prisoner Population on the Bureau of Prisons*, Executive Summary ("BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose."); U.S. Dep't of Justice, Office of the Inspector General Audit Division, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care ii-xix*, 32-34 (2008) (noting that at a number of institutions, the Bureau of Prisons "did not provide required medical services to inmates," including inadequate treatment for chronic conditions, failure to properly monitor side effects of medication, allowing unqualified providers to render medical services, and failure to meet performance target levels on treatment of serious conditions, including diabetes); Office of the Inspector General U.S. Department of Justice Review of the Federal Bureau of Prisons' Medical Staffing Challenges Evaluation and Inspections Division 16-02 March 2016, Executive Summary ("The Federal Bureau of Prisons (BOP) is responsible for incarcerating federal inmates and is required to provide them with medically necessary healthcare. However, recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs.").

At 72-years old, Mr. Fujinaga will require consistent medical services, and his health will continue to decline. He already requires more medical care than the average inmate, and as

he grows older, the BOP will be responsible for providing all of his medically necessary healthcare. Accordingly, a downward variance and 60-month sentence is appropriate.

### 2. Mr. Fujinaga has always been driven by hard work, honor, and the ability to provide for his family.

In addition to his physical health, an understanding of Mr. Fujinaga as a person is necessary for determining an appropriate sentence because it further helps to explain the circumstances leading up to his incriminating actions and decision. Several of Mr. Fujinaga's family members have written letters in his support. *See* Exs. B (Letter from June Fujinaga) and C (All letters of support sent from Andrea Fujinaga and family in HI). Their descriptions of Mr. Fujinaga's personal characteristics—as a husband, father, and brother—sheds light on his characteristics as a businessman.

Mr. Fujinaga is undoubtedly a flawed man, someone who has lost his relationship with his adult children for over a decade. *See* Ex. C (Additional letters of support from family). While it is apparent that his children and first wife struggle with their relationship with Mr. Fujinaga—there is a common thread that runs through each of their letters. Mr. Fujinaga is clearly someone who prided himself on hard work, honor, and the ability to provide for his family. *See* Ex. C (Additional letters of support from family). But, as seen by the circumstances in this case, it was these qualities combined with his fear of failure and single-minded dedication to his work, that ultimately led to his demise. In a desperate attempt to maintain his commitment to MRI's employees, clients, and investors, Mr. Fujinaga took whatever action he believed was necessary to keep MRI afloat. Although his logic was wrong and ultimately destructive, it was not fueled by a desire to defraud or to profit at the expense of others.

In light of the characteristics outlined above, this Court should consider Mr. Fujinaga's old age, physical health, and personal characteristics in fashioning an appropriate sentence.

**C.   A forty-year sentence is not necessary to provide just punishment for the offense, to adequately deter criminal conduct, or to protect the public from further actions by Mr. Fujinaga. (18 U.S.C § 3553 (a)(2))**

A 40-year sentence is not necessary to protect the public or deter Mr. Fujinaga from any future crimes and it is more than necessary to provide just punishment in light of the circumstances of the offense as discussed above. *See* 18 U.S.C. § 3553(a)(2)(A), (B), (C) (the court shall consider the need for the sentence imposed "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant"). In considering a sentence under section 3553(a), "'necessary' is the operative word, for section 3553(a) expressly dictates that '[t]he court shall impose a sentence sufficient, *but not greater than necessary,* to comply with the purposes set forth in paragraph (2) of this subsection.'" *Adelson*, 441 F. Supp. 2d at 515 (emphasis supplied).

At 72 years-old, Mr. Fujinaga's risk of recidivism is almost non-existent. In general, "older offenders are substantially less likely to recidivate following release compared to younger cohorts." United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* at 3. In fact, older offenders are less likely to recidivate after release than younger offenders, regardless of the length of the sentence imposed. *Id.* at 3. Further, the Sentencing Commission found that the type of federal offense committed has an effect on recidivism across age groups, and for fraud convictions of those age 60 and older, the rate of re-arrest was only 12.5 percent. *Id.*

Other factors also place Mr. Fujinaga at a low risk of recidivism. For example, the Sentencing Commission found that those with lower education levels have higher recidivism rates—Mr. Fujinaga attended and completed college, receiving his bachelor's degree in business administration. *Id.* The Sentencing Commission found that only 11.6 percent of individuals who were 60 years or older and college graduates recidivated. *Id.* According to the Sentencing Commission's findings, only 11.3 percent of offenders in Criminal History I, who were 60 years or older, recidivated. *Id.* Of note, Mr. Fujinaga has demonstrated nothing but

11

good behavior in the three and a half years that he was been living out of detention awaiting trial, and he has continued that good behavior during the four months he has been sitting in detention. Based on his age and history of good behavior, a lengthy term of imprisonment for the sake of specific deterrence is not necessary.

While general deterrence is another purpose behind the imposition of a prison sentence, courts have noted that, "there is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514; United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence") (emphasis supplied).

Here, the nature of MRI's business, specifically recruiting only Japanese investors, as well as the circumstances surrounding the company's demise—the 2008 crash of the dollar to yen conversion—are so unique and highly specific that a forty-year sentence will have little general-deterrent effect. Further, for purposes of general deterrence, there is no evidence to find that a period of imprisonment is the *only* way to achieve general deterrence. *See United States v. Edwards*, 595 F.3d 1004, 1017 (9th Cir. 2010) ("Section 3553(a), for instance, does not require the goal of general deterrence be met through a period of incarceration."); S. Rep. No. 98-225, at 92 ("This is not meant to imply that the Committee considers a sentence of imprisonment to be the only form of sentence that may effectively carry deterrent or punitive weight. It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose."). Accordingly, a forty-year prison term may be sufficient, but it is far more than necessary to achieve the goals of general deterrence, specific deterrence, or just punishment. *See Kimbrough*, 552 U.S. at 101; 18 U.S.C. § 3553(a)(2).

## II. CONCLUSION

MRI's business resulted in loss to many Japanese investors, but the circumstances surrounding the offense do not warrant a sentence that is comparable to sentences for businesses that enter the market with the sole purpose of preying on victim-investors. Mr. Fujinaga was careless with his management and overly-ambitious such that he failed to see the risks that come with managing a rapidly-growing and successful business. But his intent from the outset was to run a successful company that would generate income for his investors—not to defraud MRI's investors. Mr. Fujinaga's poor business decisions combined with the unforeseeable economic crash in the value of the dollar ultimately caused the loss of millions of dollars.

In addition to the remorse and shame Mr. Fujinaga feels for causing many individuals to lose their investments, Mr. Fujinaga has been undergoing litigation for the past six years, including private lawsuits in the United States, a civil judgment in Japan, a civil judgment by the SEC, and the current criminal conviction. Mr. Fujinaga is a 72-years old man who, because of his health, has a limited amount of time to spend with his teenage son. In light of all of the considerations outlined above, a guideline-sentence in this case would be unjust. A 60-month sentence is sufficient, but not more than necessary, to do justice in this case.

DATED this 4th day of April, 2019.

Respectfully submitted,
RENE L. VALLADARES
Federal Public Defender

By: */s/ Heidi Ojeda*
HEIDI OJEDA
Assistant Federal Public Defender
Attorney for Edwin Fujinaga

## CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that he is an employee of the Federal Public Defender for the District of Nevada and is a person of such age and discretion as to be competent to serve papers.

That on April 4, 2019, he served an electronic copy of the above and foregoing **DEFENDANT'S SENTENCING MEMORANDUM** via electronic mail to the persons named below:

NICHOLAS A. TRUTANICH
United States Attorney
RICHARD ANTHONY LOPEZ
Assistant United States Attorney
501 Las Vegas Blvd. South
Suite 1100
Las Vegas, NV 89101

WILLIAM E. JOHNSTON
Trial Attorney
U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20005

*/s/ Marlene Mercado*
Employee of the Federal Public Defender