UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> vs. ) <br> ) <br> EDWIN FUJINAGA, PAUL SUZUKI, and ) <br> JUNZO SUZUKI, ) <br> ) <br> Defendants. ) <br> ) | Case No.: 2:15-cr-00198-GMN-NJK <br><br> **ORDER** |

On June 28, 2022, this Court held a hearing to determine the restitution amount for Defendants Paul Suzuki and Junzo Suzuki (collectively, "Defendants"). (*See* Min. Order Restitution Hearing, ECF No. 532). The Government filed a Memorandum Regarding Restitution, (ECF No. 524), to which Defendants filed a Response, (ECF No. 529). The Court considered the parties' briefing, heard arguments from the Government and Defendant, and ultimately took the matter under submission. (*See* Transcript at 64–65, ECF No. 533). For the reasons discussed below, the Court defers imposing a total amount of restitution and orders the Government to provide a final restitution calculation by October 3, 2022, using the Court's methodology explained below.

**I.   BACKGROUND**

    **A.   FACTUAL BACKGROUND**

On July 8, 2015, a grand jury returned an Indictment for Fujinaga, Junzo Suzuki ("J. Suzuki"), and Paul Suzuki ("P. Suzuki"). (*See generally* Indictment, ECF No. 1). Defendants were indicted for owning and operating MRI International Inc. ("MRI"), a Nevada Limited Liability Corporation in Las Vegas, Nevada. (*Id*. ¶ 4). Defendant was the president, chief

1  executive officer, and sole owner of MRI. (*Id.*).  J. Suzuki was the executive vice president and
2  P. Suzuki was the general manager of MRI's Japanese operations. (*Id.*).
3      From 2009 to 2013, Defendants advertised that MRI was engaged in the business of
4  purchasing medical accounts receivable ("MARS"). (*Id.* ¶ 6).  MARS are accounts with debts
5  that medical patients owe to doctors or hospitals that provided the patients services. (*See id.*).
6  MRI advertised itself as a company that bought MARS at a discounted rate and then was able
7  to collect fully on the account in order to make a profit. (*Id.*).  The profit was allegedly derived
8  from the difference of how much was owed on the account and the amount that the MARS was
9  purchased for. (*Id.*).  MRI advertised that it was able to make this profit through its
10 "purportedly superior collections capability." (*Id.*).
11     Specifically, MRI made its profit by soliciting investments through offering Certificates
12 of Investment ("Certificates"). (*Id.* ¶ 7).  These Certificates claimed to provide investors with a
13 consistent and predictable return through the profit from the MARS. (*Id.*).  The Certificates
14 were marketed "primarily, if not exclusively" to Japanese citizens through MRI's center in
15 Tokyo. (*Id.*).  The Certificates were advertised seemingly as a bond with payments, a principal,
16 and a maturity date. (*Id.*).  Once the Certificates reached their maturity date, investors could
17 either reinvest into a new Certificate or receive cash payment of the amount they were due.
18 (*Id.*).  However, because Defendants never actually invested in MARS, they used the money
19 solicited from the new investors' Certificates to pay the prior investors' maturing investments.
20 (*Id.* ¶ 9).
21     Defendants acquired these investors by "knowingly publishing, mailing, distributing,
22 and transmitting promotional materials that falsely represented that MRI would use any money
23 invested in the Certificates exclusively to purchase MARS." (*Id.* ¶ 8).  Defendants also
24 advertised to investors that nobody from MRI, or anyone else, was able to expend investment
25 money for any purpose other than the purchase of MARS. (*Id.*).  However, Defendants

"regularly expended investor money for things other than purchasing MARS," such as "paying themselves sales commissions, subsidizing gambling habits, paying for personal travel by private jet, and other personal expenses." (*Id.* ¶ 10).

Accordingly, Defendant Edwin Fujinaga was charged in the Indictment with: Counts One through Eight in violation of 18 U.S.C. § 1341 Mail Fraud; Counts Nine through Seventeen in violation of 18 U.S.C. § 1343 Wire Fraud; and Counts Eighteen through Twenty in violation of 18 U.S.C. § 1957 Monetary Transactions in property derived from specified unlawful activity. (*See generally id.*). Defendant Paul Suzuki and Defendant Junzo Suzuki were also charged in the Indictment with: Counts One through Eight in violation of 18 U.S.C. § 1341 Mail Fraud; and Counts Nine through Seventeen in violation of 18 U.S.C. § 1343 Wire Fraud. (*See id.*). Following a 17-day jury trial, Mr. Fujinaga was found guilty on all charges. (*See* Mins. Proceeding Jury Trial (Day 17), ECF No. 262); (*see also* Partial Transcript of Proceedings 6:25–9:12, ECF No. 273). On May 23, 2019, the Court sentenced Mr. Fujinaga to a total of 50 years custody: 20 years as to Counts 1–8, concurrent to one another and consecutive as to Counts 9–20; 20 years as to Counts 9–17, concurrent to one another and consecutive as to Counts 1–8 and 18–20; and 10 years as to Counts 18–20, concurrent to one another and consecutive to Counts 1–17.[1] (Mins. Proceeding, ECF No. 330); (J. at 3, ECF No. 338).

B.   **RELATED CIVIL CASES IN NEVADA AND JAPAN**

On July 5, 2013, the victims filed suit against Defendants for perpetuating the above scheme. *See Shige Takiguchi, et al. v. MRI International, Inc., et al.*, No. 2:13-cv-01183-HDM-NJK (D. Nev. 2013) (the "Nevada Case"). From June 2013 to October 2016, the victims filed six lawsuits in Tokyo District Court (the "Japanese Cases"). (*See* Resp to Memo. 8:17–22). In

---

[1] In addition, the Court ordered Mr. Fujinaga to make restitution in the amount of $1,129,409,449.00 and signed a Final Order of Forfeiture. (*See* J., ECF No. 338).

October 2017, the parties settled the Nevada Case. (Decl. of Nicolas Morgan ("Morgan Decl.") ¶ 3, Ex. 6 to Resp. to Memo., ECF No. 529). In that settlement, only defendants were obliged to pay the settlement amount. (*Id*.). According to Defendants, they already contributed $13,100,000.00 for the Nevada Case settlement. (*Id*. ¶ 3). For the Japanese Cases settlement, Defendants additionally contributed $2,388,327.00. (*See also* Decl. of Osamu Ishida ("Ishida Decl.") ¶ 3, Ex. 7 to Resp. to Memo., ECF No. 529).

### C. PROCEDURAL HISTORY

On April 5, 2022, the Court individually sentenced Defendants to 60 months custody. (*See* Paul Suzuki's J., ECF No. 517); (*see also* Junzo Suzuki's J., ECF No. 518). The parties agreed to reserve discussion concerning restitution until after the sentencing hearing. On June 28, 2022, this Court held a restitution hearing. (*See* Mins. Proceeding, ECF No. 532). At this hearing, the Government made arguments and called Michael J. Petron, CPA, to the stand. (*See id*.). Defense counsel cross-examined Mr. Petron, and both parties concluded by giving closing statements. (*See id*.).

## II. LEGAL STANDARD

The Mandatory Victim Restitution Act, 18 U.S.C. § 3663A et. seq., requires the sentencing court to order "the defendant make restitution to the victim of the offense" when the offense of conviction or plea agreement is one listed in the statute, including those where "an identifiable victim or victims has suffered a . . . pecuniary loss." *See* 18 U.S.C. § 3663A(a)(1); *see also* 18 U.S.C. § 3663A(c)(1)(B). The purpose of the MVRA is "to ensure that the loss to crime victims is recognized," that "[victims] receive the restitution that they are due," and that the "offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society." *United States v. Cienfuegos*, 462 F.3d 1160, 1165 (9th Cir. 2006) (quoting S. Rep. No 104-179, at 12 (1996)). District courts are granted "a degree of flexibility in accounting for a victim's complete losses." *Id*. at 557. "Despite this flexibility, [the MVRA]

minimally requires that facts be established by a preponderance of evidence, and the district court may utilize only evidence that possesses a sufficient indicia of reliability to support its probable accuracy." *Id*.

### III. DISCUSSION

The Government proffers that the total amount of loss between April 2012 and April 2013 is $129,832,422.79. (Restitution Memo. 1:24–2:2, ECF No. 524). In response, Defendants make two main arguments: (1) the starting point should only include new investments made between April 2012 and April 2013 because Defendants only knew about the fraudulent scheme starting in April 2012; and (2) Defendants have already paid $15,488,327 in other civil hearings and thus should reduce the restitution by such amount. (Resp. to Govt's Memo. at 3–10, ECF No. 529). The Court addresses each argument below.

#### A. STARTING CALCULATION OF INVESTMENTS

Defendants argue, in their Response to the Government's Memorandum, that the majority of the Government's requested restitution is too attenuated to their conduct because Defendants only knew of the fraudulent scheme from April 2012 to April 2013, the time period they plead guilty to. (Resp. to Memo. at 3–8). According to Defendants, the Government's requested loss includes: (1) fresh investments made by a new investor ("Initial Investments"); and (2) renewed investments made by existing investors ("Additional Investments"). (*Id*. 6:5–8). Defendants argue that they should only be liable for any *new investments* (i.e., Additional Investments) made between April 2012 and April 2013 because they were not involved with the renewed investments, which they pin on Mr. Fujinaga, the alleged mastermind of the Ponzi scheme. (*Id*. 6:5–8). The starting amount, they assert, should total 80,988,445.91. (*Id*. 7:7–8). At the restitution hearing, Defendants further asserted that it is the Government's burden to establish the loss of each victim by a preponderance of evidence. (Transcript 63:1–10).

Defendants correctly state that "[t]he government bears the burden of proving that a person or entity is a victim for purposes of restitution, *Baker*, 25 F.3d at 1455, and of proving the amount of the loss, 18 U.S.C. § 3664(e)." *United States v. Hai Waknine*, 543 F.3d 546, 556 (9th Cir. 2008). For purposes of restitution, a victim is "a person directly and proximately harmed as a result of the commission of an offenses for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *See* 18 U.S.C.S. § 3663(a)(2). "[W]hen the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense, . . . the restitution order [may] include acts of related conduct for which the defendant was not convicted." *United States v. Lawrence*, 189 F.3d 838, 846-47 (9th Cir. 1997); *see also United States v. Grice*, 319 F.3d 1174, 1178 (9th Cir.2003) ("[P]ermitting restitution under the MVRA for related, but uncharged mail fraud conduct occurring prior to and continuing past the MVRA's enactment is consistent with the text of the statute and related authority.").

Here, the Government demonstrates, by a preponderance of evidence, that the amount of loss between April 2012 and April 2013 totals $129,832,422.79, which includes both Initial and Additional Investments. At the restitution hearing, the Government called an expert witness, Michael Petron, to explain how the Government reached the $129,832,422.79 amount.[2] (Transcript at 21). Mr. Petron cross-checked the total influx of money sent from victim-investors to MRI's bank accounts with the deposits identified in MRI's investor list. (*Id*. at 17); (*see also* Decl. of Michael Petron ("Petron Decl.") ¶ 14). Based on this comparison, the victim-

---

[2] The Government contracted Michael J. Petron, a certified public accountant and certified fraud examiner, to calculate the restitution amount for Defendants. (Govt's Memo. 5:2–3). Mr. Petron also testified as a summary witness on behalf of the government at trial, and also calculated the restitution amount as to Fujinaga. (*Id*. 5:4–6).

investors either: (1) Likely Matched; and (2) Matched, meaning that it was likely or exactly that the date, the dollar amount, and the name of the investor matched from both lists. (Transcript 19:21–23).  The amounts that did not fit within these two categories were not included in the bottom-line figure of $129.8 million. (*Id*. 21:5–6).  As Mr. Petron stated himself, the $129.8 million thus represented a "conservative number that is the amount of new money coming into MRI that [Mr. Petron could] associate directly with investment certificates that were issued during the relevant time period." (*Id*. 21:22–25).  The Government thus provided a credible and reliable expert to calculate the starting amount of restitution.

      Existing Ninth Circuit caselaw and the Plea Agreement further confirm that such amount can include loss arising from Defendants' related, but uncharged conduct. *Lawrence*, 189 F.3d at 846-47.  Defendants pleaded that "[f]rom in and around April 2012 through in and around April 2013, defendant, co-defendant Paul Suzuki, Fujinaga, and others *fraudulently induced* over one-thousand investors to invest more than $141 million in MRI, which resulted in substantial financial hardship to at least 25 investor-victims" (*See* Plea Agreement at 10) (emphasis added).  The Plea Agreement further states that the "defendant agrees that the district court may order restitution to any victim of any of the following for any losses suffered by that victim as a result of" any relevant conduct and any uncharged or dismissed counts. (*See* Plea Agreement 6:3–15).  Nevertheless, the Government's representations at the hearing support a finding that Defendants made material statements by representing to "old" investors that the scheme was legitimate, when, in fact, Defendants knew it was fraudulent.  Specifically, the Government confirmed, at the hearing, that:

> Paul Suzuki ran the seminars.  He's the one that's meeting.  There are faxes where we talks about, I'm sorry I haven't gotten back to you, Mr. Fujinaga. I had 25 seminars.  You know, I don't know how to handle investors asking what's going on with their delayed payments.

(Transcript at 58).  Though Defendants did not directly bring in these "old investors" into the scheme, their material statements confirming the legitimacy of the scheme effectively furthered the scheme. *See Grice*, 319 F.3d at 1177 (holding that "[r]estitution may be ordered, however, for losses attributable to acts that occurred before and after the effective date of the MVRA when the offense is a conspiracy").

Defendants' reliance on *Swor* is further misplaced.  In *United States v. Swor*, 728 F.3d 971, 974 (9th Cir. 2013), the Ninth Circuit vacated a district court's restitution order for $166,887.09 because Defendant Shawn Swor's connection to his co-defendant Schultz's losses were too attenuated to impose liability. *United States v. Swor*, 728 F.3d 971, 974 (9th Cir. 2013).  The Ninth Circuit held that Swor could not be held accountable for the losses of Schultz's victims, even though Swor introduced Schultz into Two Feather's scheme. *Id*. at 974. The causal connection "amounted [. . .] to introducing two people to each other in the course of carrying out a fraudulent scheme, where the two later, and independently, became involved in a separate, operationally different fraudulent scheme." *Id*.  Because Mr. Swor severed ties with the business and co-defendants after the FBI's involvement, the Ninth Circuit held that Swor should not be held accountable in its restitution order for the losses of Schultz's victims.

Unlike *Swor*, Defendants in the present case did not sever their ties with Mr. Fujinaga's scheme at any point. (*See* Transcript at 58).  In fact, Defendants did the opposite—they continued the scheme even after they knew the scheme was fraudulent.  As the Government stated at the hearing, "[o]nce [Defendants] entered into the scheme after April 2012, they're liable for the fraudulent investments induced in connection with that scheme and in connection with the other defendants, including Mr. Fujinaga." (*Id*. 48:21–24).  The Court accordingly finds that the Government has demonstrated, by a preponderance of the evidence, that the total amount of loss includes both "new" and "old" investments between April 2012 and April 2013.

//

### B.   REDUCTION OF CIVIL HEARING SETTLEMENT

The remaining issue is whether the total restitution amount of $129.8 million must be reduced by $15,488,327, which is the total payment Defendants contributed to the settlements in the Nevada and Japanese civil cases. Defendants argue that, pursuant to 18 U.S.C. § 3664(j)(2), they do not have to pay restitution in the present criminal case because they have already paid some restitution in the civil settlements.

Under 18 U.S.C. § 3664(j)(2), "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in . . . any Federal civil proceeding." Although the most simple solution would be to deduct the $15 million from the total $129.8 million, Mr. Petron explained that it was inaccurate for the Court to simply deduct the $15 million paid out from the civil settlements because the civil settlement potentially covers a longer time period than the restitution, (i.e., April 2012 to April 2013). (Transcript 32:2–8).

The Court agrees that pursuant to 18 U.S.C. § 3664(j)(2), Defendants' total restitution amount should be reduced by the amount Defendants paid to the same victims in the civil settlements for the same loss arising out of the fraudulent scheme. Any victim who has already received payment from Defendants in the civil settlement should not also receive restitution from the criminal hearing. *See* 18 U.S.C. § 3664(j)(2). Hence, the final restitution amount must only include loss to victims who Defendants have not yet compensated for the scheme. To ensure this, the parties must compare the list of victim-investors from the civil settlements with the list of victim-investors from the current restitution. (*See* List of Victim-Investors, Ex. F to Govt's Memo., ECF No. 524-1).

//
//
//

Alas, because the parties do not have a list of victims from the settlement, the Court cannot presently calculate the potential deduction from the current $129 million of restitution.[3] Mr. Petron, at the hearing, agreed that he would be willing to work with the United States Probation Office or the Court to compare the list of victims paid from the civil settlement with the list of victims from Mr. Petron's list of "Likely Matched" and Matched" victim-investors. (*Id*. 32:11–16).  Mr. Petron testified that he would conservatively deduct money from the civil settlements to the restitution schedule "regardless if the time periods don't match precisely, regardless if it's for the same investment certificates or not" for the ease of computation and equitable relief for the victims. (Transcript 30:6–12).  The Court agrees with Mr. Petron's suggested methodology and accordingly orders the Government provide an updated restitution list, working with Mr. Petron, comparing the List of Victim-Investors in Exhibit F to the Government's Memorandum with a list of victims from the civil settlement.[4]

## IV.   CONCLUSION

**IT IS HEREBY ORDERED** that the Government shall provide an updated restitution list deducting the amount of civil settlement using the above methodology, by October 3, 2022.[5]

**DATED** this __2__ day of September, 2022.

_____
Gloria M. Navarro, District Judge
United States District Court

---

[3] Neither party presented a list of victims from the civil settlements in the Nevada Case or Japanese Cases. (Transcript 33:17–22) (indicating, from the Government's perspective, their willingness to contact victim counsel from the civil cases to get settlement orders, documents or a sort of ledger to compare).

[4] Exhibit F is the restitution schedule the Government recommended that includes both Initial Investments and Additional Investments. (Transcript 22:17–22).

[5] After the Court receives a final list with the requested deductions, the Court will thereby amend the judgment to include the restitution list.